May it please the Court, I'm Karen Landau, and I represent Kenia Munguia. The main issue in this case is that Kenia Munguia was deprived of her right to present a defense. Her defense was that she lacked the mens rea required to be convicted of conspiracy to aid and abet in the manufacture of methamphetamine and conspiracy to possess a listed chemical, knowing or having reasonable cause to believe that it would be used to manufacture methamphetamine. She's a battered woman. She was not allowed to present. Her expert psychologist, who would have testified about her mental impairments, and Would the psychiatrist have testified that her impairments bore upon her ability to understand what the drug was being used for? Yes, I think he would have. Can you then point to anything in his reports in which he says that because he talks a lot about her conduct, he talks a lot about why she didn't phone or why she didn't contact the police, why she didn't leave him, why she didn't even ask questions? But where in the report does it say that by virtue of the fact that she suffers from this syndrome, she was unable to understand that these purchases were being used for drugs? Where in the report does that say it? And where, wait, so you have the questions, am I. Where in the report does it say it? And where does the defense attorney in his proffer to the court say that this expert testimony will opine on the issue of whether she was able to understand that these substances were going to be used for drugs? Let me answer your question in a couple of parts. First, I don't think the question only is limited to whether she could understand. It's a broader question, and it's whether the psychologist had information that bore on whether she, in fact, formed the requisite intent. Now, in the report, to go to the first part of your question, if you go to ER, the report starts at Excerpt of Record 105, and there are a number of things from which it's, from which one can reasonably infer that the psychologist would have testified to her cognitive ability. Among other things, the psychologist diagnosed her with major depression, which is not a minor, is not an insignificant diagnosis. Major depression affects cognition and ability. Where in the report does he say that by virtue of the depression, she was unable to, well, let's hear me out, because I think the report is very significant in terms of her conduct. That is, why she didn't do X, why she didn't do Y, why she didn't do Z. But nowhere in the report do I find some statement from the expert to say that by virtue of the syndrome and by virtue of the depression, she was unable or would be impaired in understanding the nature of the transaction. That is what these, what the substance could be used for. Now, if it's in the report, just show it to me. If it's in the proper, just tell me about it. Again, I have to say that it's a reasonable inference from the report, and that any district judge who read this report and saw that she's depressed and read the whole thing, I mean, Your Honor, I have seen better reports. I also have seen far worse reports in this case. But what do you think the report proves that prevents her from, that the exclusion of the report prevents her from presenting her defense? What is it in the report? Well, she didn't have anybody. Ultimately, she testified about her relationship with the cooperating witness, who was also her abuser. And she testified that she didn't know what the pills were going to be used for. And the government argued two things. The government argued that she had direct intent that she did know, based on the boyfriend's testimony and based on the police officer testimony. And also the government argued that she would have had reasonable cause to believe, based on the number of purchases. But the report would have provided information about her background, and it would have, first of all, it would have corroborated her testimony about the lack of direct intent, which the jury certainly was entitled to hear, given that the government proceeded on two theories. You know, I can't say that there's a place in this report, because the psychologist doesn't say, oh, she didn't know what she was doing. And frankly, he wouldn't have been allowed to so testify anyway. But what he could have testified about is the general characteristics of battered women and major depression and how that affects a person in her situation. And that is evidence. To what? Of course it affects them. I mean, that's your entire brief. The amicus brief, 28 pages of the amicus brief, puts out the fact that it affects their conduct, understanding it affects the conduct. That's not the issue in front of the court, is why she did what she did. The issue is whether have they known that she had suffered from battered women's syndrome? Had they known that she suffered from major depression? Then it is a reasonable inference to believe she wouldn't have known that these drugs, that her 600 purchases and so forth, and her emptying the baskets, the containers and so forth, and the trash repeatedly, she wouldn't know that the drug was going to be used to manufacture another drug. That's the question. Not her conduct, but her knowledge, her state of mind. Right. But I don't think you can separate conduct from intent that easily. Normally intent is proved from conduct. And the question of what she knew or had reasonable cause to believe, I think one of the things that the psychologist would have testified to is her attentional focus. And, remember, there was evidence in this case that my client was not well educated. She dropped out of school effectively in the ninth grade. By the way, anywhere in the report where he says that she was not able to focus on the issues or that she was, it says that she was depressed. He talks about what she was focused on, which was placating her boyfriend. But that, and the interesting thing about that is that, indeed, it would be a defense and a recognized defense if a duress defense was being offered. And normally that is what the battered women's syndrome is used for in a number of cases, to say she acted a particular way because she was under duress. This is asking a very different question. This is asking what either she knew or what a reasonable person, given the facts that they had in her position, would have known. And, by the way, let me just ask this other question. Aren't you asking this circuit to adopt the tenth circuit's definition of the difference, a subjective determination rather than an objective determination? Because under the two cases that have been cited of the law of this circuit, it talks about a combination of objective and subjective. It talks about that combination. And the question isn't what you're urging the court to say, look, forget about the objective, what is what a reasonable person would do knowing all the facts that were presented to the defendant. Do or no? No rather than do. But it's the defendant who is suffering from battered women's syndrome and major depression, what that person would have known. And isn't that totally a subjective determination? It's not objective. It's subjective. Let me answer that question, Your Honor. Well, first of all, I don't think ‑‑ I do think that this Court approved of the tenth circuit case. In fact, it quoted from Saffo in Cower and Choho. But let me go on. The thing is, the statute calls for reasonable cause to believe. It doesn't call for a reason ‑‑ it doesn't apply a reasonable person standard. So the question is, and what this Court has actually said is, whether the defendant has reasonable cause to believe. And I would submit that that requires consideration of the defendant's personal characteristics. If there are any, there may not be any. But, for example, what if we have a defendant with a low IQ that falls below 70, and they're charged with buying ‑‑ they're charged with a violation of this statute, 841C2. If it's a reasonable person and you're effectively importing a tort standard into what makes somebody criminally culpable, then that mentally retarded person is not going to be able to present evidence about their low IQ. Or somebody who has a step above, borderline intellectual functioning, won't be able to present evidence. And that's what happened here. We have a defendant who is in a particular circumstance, and she wasn't allowed to present evidence that would have corroborated her testimony that she didn't know. Because ‑‑ But how? You're arguing your result. You're saying that the battered woman syndrome would corroborate her testimony that she didn't know something, not that she wouldn't do something. And that's the problem. I understand a mentally retarded person. Evidence of mental retardation actually goes to what you would know. What you would know. And, you know, Your Honor ‑‑ The battered woman syndrome, how does that go to ‑‑ The battered woman syndrome is not one thing. It is not a psychological diagnosis. It's a complex of symptoms. And what this defendant had, and that's what we're focusing on. If you read the report, it says this is a complex of symptoms. I'm sure you have. I apologize, Your Honor. I didn't mean to insult you. This ‑‑ That's okay. We insult each other all the time. Don't worry. Look who I'm sitting with today. They're not shy about disagreeing with me. Ms. Landau, I think you should pay a little more attention to answering this various question. How does it say in the report that the battered woman's syndrome or her depression would affect what she understood as opposed to what she would do? There is a difference, and you're talking about a part of the offense, which is what a woman, let's say in her position, what a person in her position would understand. It doesn't say what a person in her position would do. She might be want to please her boyfriend, and that may be why she did it. But that's not what we're talking about at the moment as I understand it. We're talking about whether it would affect what she understood. And, Your Honor, I have to go back again to the diagnosis of depression, which is known to have an impact on a person's cognition. And, again, this is a case where the ‑‑ and I am trying to answer Judge Breyer's question as best I can. I did not represent this defendant below. And, you know, there ‑‑ That's one of my least favorite explanations. I apologize, Your Honor. But when you read the report as a whole, and it's clear that the defendant suffered from major depression. She had four suicide attempts. There is enough of an attentional ‑‑ there's enough information in here that she would have lacked attention, would have lacked focus, and it explains why she wouldn't have inquired. And let me point out one other thing. So you don't keep talking about that. I certainly understand, because I know enough about the syndrome, and accept the testimony here that she wouldn't have inquired. Actually, she said she did. And she actually said she asked twice. She said she asked the first time, and she said, it's better that you not know. Words without effect. She asked the second time, and then some rather remarkable story about ‑‑ The Red Bull. The Red Bull, right. And she asked nothing further. Nothing further. So I can understand the syndrome contributing to her not behaving a particular way, but we're actually not talking so much about behavior, but about knowledge. And I understand they're not unrelated. Yes. I understand your point, Your Honor, and one response I have is that it's important to keep in mind that the use of pseudoephedrine in methamphetamine manufacture is not commonly known. And, in fact, the government put on a law enforcement agent, a drug expert, to testify about. It's how it is used in methamphetamine manufacture, and more specifically the role that people who go around buying these cold pills play in methamphetamine manufacture. So my point is, if you look at her, a depressed person, a person who may or may not be reasonable, and that gets back to the point of the fact that women's syndrome is not one thing. It is not only duress. It can create a diminished mental capacity, and that is throughout the report. And in this case ‑‑ I'm sorry. You say that throughout the report it's about diminished mental capacity? Well, it's about ‑‑ in this report there is a lot about diminished mental capacity, I would say. A reasonable influence, which I am entitled to argue. If there's no more questions, I'll save ‑‑ I would save the rest of my time for rebuttal. Do you think that the omission from the instruction of the words in her position is prejudicial? Yes, I do, Your Honor. If you want an explanation ‑‑ I mean, you are arguing that the omission of that in itself requires reversal. Yes, I do, particularly in this case, because she testified on her own behalf that she was battered and that she didn't know, and her sister testified as to the one incident. But isn't it in her position, doesn't that mean ‑‑ doesn't mean two things. What that person would have done or thought, what that person would have thought, that's in her position. That's subjective, it talks about her. Or does it mean a person who suffers from battered women's syndrome and depression? You're saying it's the latter. That's what's meant. That's what you want to invite the jury to consider. Yes. If all the evidence came in, a person who was suffering from these maladies, these infirmities. And if that's true, isn't that a totally subjective test? No, because it's still objective, because the jury ‑‑ it's still a hybrid test, because the jury still is going to consider what she objectively knew. I mean, you could have that situation, you could have ‑‑ if that instruction, I mean, let's say I would still be arguing, even if the correct instruction had been given, I would still be arguing that the evidence should have come in, because it would have bolstered that. But the jury still is going to consider the objective facts, which is she went out and she bought the pseudoepidurine and she drove around, and whatever other objective facts there are. But the thing is, the subjective part of it is that the jury gets to consider the facts, the objective facts about her situation. Those are objective. It's a hybrid test. It's not, again, I have to stress this, it's not whether a reasonable person would have known that the pills were going to be used to manufacture pseudoepidurine. It's whether this person, this person had reasonable cause to believe that's what the statute says. Let me ask you this, reasonable cause to believe, not that the pills that she was buying would be used for a bad purpose, but rather that they would be used to manufacture a controlled substance. That's what she has to be unnoticed about. Right, it's a specific intent. So it's not criminal if she had reason to believe that they were selling them at an exorbitant price to vulnerable people. She has to have reason to believe that they're going to be used to manufacture a controlled substance. That's right. That's what the statute says. And, in fact, this, it's, I mean, again, I have to stress this, it's not that she thought there was something fishy going on or she was uncomfortable. But that could have been argued, and I assume it was a fraud. It says, look, the government hasn't proven, hasn't proven, that she knew or a reasonable person would have known that it was going to be used for amphetamine, for methamphetamine. I mean, that, that wasn't eliminated, that wasn't eliminated from the jury's consideration. They could, they could. They could have, but she didn't have anything to corroborate her testimony. Well, no, no, no. All about how difficult it is to know that it's not in everybody's experience that pseudofedrate is being used. It's broken down, it's used for methamphetamine and so forth. That's not in a person's experience. Whether they're depressed, not depressed, they don't know it. And a person, you know, wouldn't know these things. She didn't go to chemistry school, blah, blah, blah. That's fine. I understand that. But those are arguments that could be made. They weren't precluded. That's correct, Your Honor. And, again, I have to come back to the fact, though, that this case was tried on two theories, direct intent, and it was a swearing contest between my client and the boyfriend, who denied that he batted her and said he told her. And, yeah. Thank you. Good morning, Your Honors. My name is Jennifer Williams, and I represent the Government on Appeal and was trial counsel in this case. Opposing counsel on appeal struggles to cite the report for what it has been argued to offer. And opposing counsel below also struggled with that same concept. And I believe that's why opposing counsel below offered the report only with respect to the reasonable cause to believe standard, because opposing counsel below recognized that the report does not say anything about battered women's syndrome and its effect on the defendant to perceive what's going on correctly or incorrectly. The report was prepared for a different purpose. The report was prepared for sentencing purposes. It sounds like it was prepared for an immigration case. Oh, I'm sorry, Your Honor. I misunderstood the context of your comment. The report was prepared and attached to a letter from defense counsel, basically asking for a different plea was the first, the preliminary report. But proceeding to trial, the final report was offered. And in that final report, the expert concluded that the defendant suffered from depression and that the defendant displayed characteristics of battered women's syndrome. And the defendant asked for an instruction that said reasonable person in her position. Can I ask a question that's not the report but rather the instruction? Ms. Landau has argued that the instruction given was wrong. At trial, the defendant asked for an instruction that said reasonable person in her position. And in her position was not allowed. Do you contend that the instruction given was proper? I do, Your Honor. And it was taken. And why is that proper given our decision in Joe Hall? Well, the instruction given in this case was taken verbatim from Joe Hall. And the instruction told the jury that reasonable cause to believe means that you look at what the defendant, the facts that the defendant knew, and then you decide whether that caused the defendant to know or a reasonable person to know. I'm reading Joe Hall, and it says, fraction of the jury can infer that any reasonable person in the defendant's position. And the language in the defendant's position was the language that was requested, and that was the language that was not allowed. So how can you say that the instruction was proper? I'm on page 828, first column, about six lines down. 828, sorry, Your Honor. 428, F3rd, 828, first column, about six lines down. The sentence starts in the second line of that column. Oh, such a reading would be redundant? No. Are you on page 828? However, reasonable cause to believe is not purely objective, but turns on the – and now it's italicized. Thank you. It turns on the facts actually known by the defendant in a particular case fact from which the jury can infer that any reasonable person in the defendant's position would have had to know that the ingredients were being bought to make illegal drugs. Yes. And I think what the court was doing here was just explaining its holding. On the page prior, where it cites it, Head Note 3, relying on Carr, we hold that reasonable cause to believe requires that a defendant subjectively know facts that either cause him or would cause a reasonable person to believe that the ingredients are being used to produce illegal drugs. That was the instruction that was used by the district court in this case. Right, but then when you get to the sentence just read to you by Judge Breyer, Joe Hall makes it very clear that we're talking about not the hypothetical reasonable person, but a reasonable person in the defendant's position. And the instruction requested would have added in the defendant's position, and that language was not allowed. So it seems to me that the instruction was wrong. Now, what that means in terms of what we're supposed to do about it, that's a different question. But it seems to me that Joe Hall says very clearly that if there's a request to make clear who this reasonable person is and what's the position of the reasonable person, Joe Hall says if you're asked to specify more clearly what do you mean by reasonable person, you've got to say in the defendant's position because that's what Joe Hall says. I respectfully disagree that that's the holding of Joe Hall. I think Joe Hall's holding is very clear. But, I mean, I just read that sentence. It says facts from which a jury can infer that any reasonable person in the defendant's position. That's clear language to me. That's the court's response to Joe Hall's argument. It does say, it does say in the defendant's position. So the question is what does that mean? And one can read Joe Hall to say it means knowing the things that the defendant actually knew versus, what's being suggested, versus this person with all their disabilities hearing the things that a person would have known at that time. Correct. And the correct reading is the former based on both Joe Hall and Carr, that it is a both subjective and objective test. You look at what facts the defendant actually knew. And then the question becomes objective. Based on those facts, what would an objectively reasonable person conclude based on those facts? You see, on that one, I don't think we're right. Because what we're after is this is a mens rea for criminal guilt of this particular person. Correct. Not some reasonable person, hypothetical, the reasonable man on the street. So you've got to view it, as Joe Hall says, someone in the defendant's position, or in the language quoted immediately afterwards in that paragraph, from the Tenth Circuit position, through the lens of this particular defendant. I mean, that's what the Tenth Circuit language says, which is quoted here. So it's not just some Joe Schmo reasonable person on the street. It's this person. But this person goes to, and that's accounted for in the jury instructions and the way that the case was argued, this defendant goes to what this defendant actually knew. And the courts in Joe Hall and Carr have rejected and foreclosed an argument that otherwise this statute would impose criminal negligence. The court has clearly said no, that is not the case. There is a criminal mens rea because you have to look at the facts the defendant actually knew. Let me ask you this just in terms of our understanding of the language about what we mean from someone in the defendant's position. Sure. Ms. Landau suggested someone who's mentally retarded. Let's take someone who is not mentally impaired at all, sort of a prototypical reasonable person in this sense, but ignorant of certain things. I don't know, a foreigner coming to this country. We say certain things to the foreigner, to us it's very clear what's implied or meant. The foreigner doesn't understand because they don't have the same cultural cues. Now, who's the reasonable person? Is it what I would understand as a reasonable American or would this be what a reasonable German person who speaks English quite well but is not culturally assimilated? What are we looking at? Reasonable person in what position? The first prong is you have to show what the defendant actually knew. So if because of his cultural knowledge or not knowing, the defendant did not actually know certain things, then the defendant would not be guilty under the reasonable cause to believe standard, just like the person with a low IQ. If because of a low IQ, the person was not able to comprehend, there was proof that they were unable to read the receipt that says you can't buy more than 3.6 grams. You see, what bothers me here is that we've basically got a swearing match between the boyfriend and the defendant. The boyfriend says, she knew because I told her. She says, I asked a couple of times. First time he says you shouldn't, you don't want to know. Second time, I use it with my red ball. If we believe her testimony, she didn't know that it was being used to manufacture a controlled substance. And the jury might be able even to conclude a reasonable person in her position would not have known. But the jury was not allowed to know that it was from her position because the instruction just says a reasonable person. So what I'm trying to get at is the jury's not invited to say, we're talking about what she knew. The jury's invited to talk about some reasonable person who knew these facts. The jury was instructed that reasonable cause to believe means that the defendant actually had to know facts that either caused her or would cause a reasonable person. A reasonable person. Yes, and so in arguing... I'm afraid that's exactly my problem. We do know, in fact I don't think you're contesting this, that most people on the street don't know that Sudafed can be used to do meth. Is that right? That's correct. But most people on the street aren't visiting over 500 stores buying this. So it's unfair to... It seems to me that any sensible juror would know that she knows something fishy is going on. That's clear as can be. She said so herself. Yes, but the question is not whether something fishy is going on. The question is whether she had reasonable cause to believe that they were being used to manufacture a controlled substance. Correct. That's a different question. And as Judge Breyer pointed out, that was argued by defense in trial, that she's an uneducated woman, that she was told by her boyfriend it's better for her not to know. I understand all of those things, but then the jury instruction doesn't instruct the jury that you're allowed to look at this from her perspective. No, it just says reasonable person. The jury is instructed that they have to consider the facts that she actually knew. I understand that, too. They are said. They're told, knowing the reasonable person, knowing the facts that the defendant knew. So that's a subjective part of it. Correct. Now that if you add to it, knowing the facts that the defendant knew, given her position as a battered person or as a depressed person, then it turns it into, at least my thought about it, turns it into a totally subjective test. Correct. It's either did the defendant know or somebody who is exactly like the defendant know, and that's clearly not what Congress held or Congress decided or intended or what this Court has clearly held in Joe Hall and Carr, that it is whether a person knowing all of the facts the defendant knew. And so, for example, if the report had said, which it did not, if the report had said that because of the defendant's trauma, she was unable to perceive facts or she was under the belief that her boyfriend was always acting legally. I'm just trying to cut some sort of delusional disorder. I think that that would be relevant. But here, there is nothing in the report that says that. The report only seeks to explain why the defendant was in this relationship in the first place, and it was a subconscious attempt to heal herself from the trauma that she experienced as a child. This is a matter that is appropriately considered as it was by the district court, which reflected less than half of the guideline sentence for this defendant. No, it's very clear that the district judge had some real sympathy because of this complex effect, and that's quite obvious. Yes, and the district court carefully exercised its discretion. The district court, having been a former state judge, as the court explained, knew what battered woman syndrome was for and the cases that it's appropriately allowed in. I think the district court really tried to understand it in this case. Because the reports did not speak to the battered woman syndrome and how it affected the defendant's ability to know what was going on, counsel below really narrowed it by saying that this is only used to explain what a reasonable person would believe, and that reasonable person needs to be evaluated under a battered woman standard. And so the whole premise of the defendant's argument below is based on an incorrect legal reading of Joe Hall and Carr. Well, I'm afraid I shared that incorrect legal reading. It seems to me that, I mean, I guess I'm Scalia. It seems plain to me. I've got to read the language. No, I don't care. However you come out of this case, I don't think that that's appropriate. I just don't think that it can be more clear from the holding that says we hold that this standard is that a defendant subjectively know facts, that a defendant subjectively know facts that would either cause him or would cause a reasonable person to believe. So even under the reasonable person standard, you're looking at the facts that the defendant knew, and that would cover your concern. If it's somebody who's here from another country and they can't comprehend things, or if it's somebody who has a low IQ, if it's somebody who's blind and they're unable to perceive, or somebody that has a delusional disorder. None of those were the case here. We're all out of time, and nobody is out of time. No one has mentioned an issue which I find somewhat disturbing, which is the prosecutorial misconduct. Yes, thank you, Your Honor. I would like to address that briefly, as it is an issue very important to me. Yes, I understand. And I, you know, I have some difficulty understanding what's prosecutorial misconduct in argument and what isn't. You know, I mean, I think a lot of it's just abstract theory and really not any different in reality. But the idea of saying, you know, I told him to tell the truth, and I explained to him, and, you know, some of this comes from the trial and some of it from the argument. And I made it very clear to him that if he didn't tell the truth, there would be serious consequences or whatever. And then at the end of the argument to say, well, you know, he was told if he lied, something terrible would happen, and yet here he isn't. He's still here, and it hasn't happened to him, meaning, therefore, he didn't lie. That's the way I would interpret it. You said there were two interpretations, and there could well be. Well, I'm afraid that defense counsel did a nice job painting this picture for you. And I carefully went through everything and would like to just address both very briefly the questions on redirect examination with a cooperator and then the remark at rebuttal. And I certainly recognize that the use of the word I can carry with it a weight of the government putting its prestige behind the credibility of a witness. But in this particular context, that is not the case, and I don't think it can be fairly read as the case. On the cross-examination of the cooperator, defense counsel methodically went through every meeting that the cooperator had with the government. And in doing so, defense counsel used names of the different prosecutors. Who did you meet with? Was it Jennifer Williams or was it AUSA Justin Rhodes? Did you meet? Then on the next day, who was there? What agent was there? What prosecutor was there? You signed this plea agreement that Ms. Williams talked to you about, correct? This is all basically on record of Record 146 through 180. There was a lunch break, and then after lunch, defense counsel asked the cooperator, did you meet with the prosecutor over lunch? All of that was an appropriate way to impeach the cooperator by saying that his discussion about the defendant had only recently come up in the meetings, because in the prior meetings, as the government argued, the government was more interested in finding out where these pills were going upstream and not necessarily defendants' individual involvement, although that became more important as the trial approached. But defense counsel was setting up an argument that he was fabricating it and that perhaps I was coaching him to do so. And so on redirect, the question was, when you met with the government on X day, what did I tell you? Now, in retrospect, I should have said, what were you told? Perhaps in a passive voice, but I did not. That's really the problem. The problem is the closing argument. The problem is, I think you've got it right, too, because that happens in thousands of cases. Sure. And the prosecutor suggests this, and the prosecutor suggests that. It's perfectly proper, and redirect is perfectly proper. I think the issue is, at the end, you say, in your closing argument, and you put it in motion, what did you say, and what are the interpretations of it? Yes, so what I said in closing was, and he still has his plea agreement, and when I said that, it was after talking about each of these individual meetings. And I think that's the problem. If he tells a lie at any point, the plea agreement goes away. And he still has his plea agreement. Yes. If he tells a lie at any point, his plea agreement goes away. He still has his plea agreement. In retrospect, the one interpretation of that is that I'm implying that I have a way to evaluate his credibility and that the jury should trust me. But I think that a fair reading of that, and what I intended on rebuttal, is that he has had his plea agreement each time that he met with the government, and this was brought out in cross-examination when he signed his plea agreement, which was right before he was let out. So he had his plea agreement each time he met with the government, and he still has his plea agreement, meaning his plea agreement exists, and I'm reminding the jury of his obligation to testify truthfully under the terms of his plea agreement. Inartfully so, but that was my intention. I don't think you had an evil intention in any way, and I don't think that's the question. I mean, this, as I started out, this whole idea of what is improper for a prosecutor to say is somewhat baffles me. Obviously, the prosecutor or the government is supposed to believe that the witness is telling the truth, but it has an obligation not to put the witness on. That is definitely true, Your Honor. Nevertheless, the way the law has developed in this area, if you vouch for it, I mean, there may not be anything really wrong if we were in law school with vouching for a witness. Yes. But the law is that there is, and the question is that if he told a lie at any point, it would go away, and he still has the agreement, meaning he hasn't told a lie, and that sounds like vouching to me. I think that that is one interpretation. The interpretation that I urge the court to take is that he still has his plea agreement, calling on the jury to recognize that he has an obligation under the terms of his plea agreement. And even if the court were to find vouching, which I hope that it does not, but even if it were, the question is, is it harmful? And here, I ask the jury to disregard the cooperator's testimony in its entirety. And so I don't think that the testimony was so critical to the jury's finding that it's more likely than not that the result would have been different if this were vouching. You said we could disregard the boyfriend's testimony? I asked the jury to disregard his testimony entirely. Is that in our actions? I'd like to read that because I have no idea. Right. I heard it in the closing argument. You said, you can totally disregard. The boyfriend said, I told her that it was useful. I said, fine. Don't believe it. Disregard it all. Now look at the 600 purchases, the this, the this, the this, the this, and this. That all shows. So you're saying that then she could know that it was a drug transaction if she disregarded the boyfriend's testimony? I argued that she either knew or she certainly had the facts that would cause a reasonable person to know. Could you put my nose in that part of the argument? That part of the closing? Yes. Thank you. I thought that the only reason she should have known that this was used for the purpose of manufacturing drugs was that he had said it. Here's the law. Here. Page 282. That Edwin, alas, is not a good person. We know that. You can disregard his testimony entirely. And all of this is still before you. And all the discussion about Edwin, alas, is just to keep you looking over here and not to keep you looking here. I mean, I think your point is absolutely right. Evidence, yes. I mean, that was the argument. The argument is that there was enough evidence outside of the co-defendant's testimony to convict her. Correct, Your Honor. Thank you. I know I'm well past my time. I'm sorry. I appreciate it. Thank you. Your Honor, I'd just like to, I know I'm out of time. I'd like to address the following, the point on prosecutorial misconduct. Yes, it's true. The prosecutor said that Edwin, alas, is not a good person. And you can disregard his testimony entirely. But the very next thing that the prosecutor said is, Edwin, alas, did come into government after he was arrested, et cetera, et cetera. And she explained the prior statements. And then she said, and you heard that he has a plea agreement. And you heard that if he tells a lie at any point, that plea agreement goes away. And he has been meeting with the government to provide all of this information since August of last year, and he still has his plea agreement. So she may have said it with one hand, but she took it back with the other. And I discussed with him, I know I'm out of time, so I will not go into how this affected the verdict. The defense counsel said that Edwin, in the defense counsel's opinion, personal opinion, Edwin, alas, was a liar. Right? I don't believe he actually said that. I did not. You may be correct, Your Honor. I would have to go back and review that. But in any event, that doesn't justify the prosecutor's vouching. And it happened at a point to when there could be no reply. So if there's no further questions, I will submit. Thank you. All right. Thank you very much. The case just argued will be submitted. Next case is Lasker v. T-Mobile. Thank you, Your Honor.
judges: Breyer, Reinhardt, Fletcher